# IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
## AT JACKSON
### Assigned on Briefs April 12, 2011

## STATE OF TENNESSEE v. DEANDRE BLAKE

**Appeal from the Criminal Court for Shelby County**
**No. 08-06637     John T. Fowlkes, Jr., Judge**

---

**No. W2010-00468-CCA-R3-CD  - Filed September 23, 2011**

---

The defendant, Deandre Blake, appeals his two Shelby County Criminal Court jury convictions of first degree murder, claiming that the convicting evidence was insufficient, that the trial court erred by admitting prejudicial photographs into evidence, and that the court erred by overruling his pretrial motion to suppress his written statement to the police. We affirm both the conviction in count one of felony murder predicated upon aggravated child abuse and the conviction in count two of felony murder predicated upon aggravated child neglect.  On remand, the judgment in count one must be amended, and the trial court should effectuate merger, in part, by vacating the judgment in count two.

**Tenn. R. App. P. 3; Judgments of the Criminal Court Affirmed in Part, Vacated; Case Remanded**

JAMES CURWOOD WITT, JR., J., delivered the opinion of the Court, in which ROBERT W. WEDEMEYER, J., joined.  JOSEPH M. TIPTON, P.J., filed a concurring opinion.

Phyllis Aluko, Assistant Public Defender (on appeal); and Diane Thackery and Tim Albers, Assistant Public Defenders (at trial), for the appellant, Deandre Blake.

Robert E. Cooper, Jr., Attorney General and Reporter; J. Ross Dyer, Assistant Attorney General; William L. Gibbons, District Attorney General; and Bobby Carter and Scot Bearup, Assistant District Attorneys General, for the appellee, State of Tennessee.

## OPINION

The convictions of felony murder in this case result from the July 28, 2008 death of the two-year-old victim, who was the defendant's daughter.

*Pretrial Hearings*

The defendant filed pretrial motions to suppress his written statement about the case and to exclude certain photographs from evidence.

In the pretrial hearing on the defendant's statement, Memphis Police Department Lieutenant Ronald Collins testified that, during the July 2008 investigation of the victim's death, he participated in the interrogation of the defendant. The defendant had been arrested at 8:10 p.m. on July 28, 2008. Lieutenant Collins testified that the defendant was in custody when the interrogation occurred. Lieutenant Collins recalled that the officers advised the defendant of his rights at 11:25 p.m. and that the defendant signed an acknowledgment of his being informed of his rights. He stated that the defendant's speech was not slurred, and he agreed that the defendant appeared to be "okay." The lieutenant determined that the defendant had attained the tenth grade in school and could read. He testified that the defendant executed a written waiver of his rights and understood that he would be questioned and may be asked to give a statement. The waiver process and interview lasted past midnight and into the early hours of July 29, 2008.

Lieutenant Collins testified that a typist typed the questions and answers and that the defendant read the typed statement, initialed each page "indicating that everything on that particular page [wa]s correct," signed the statement, and wrote out the date and time – "July the 29th, 2008, at 1:00 a.m."

Lieutenant Collins denied that the defendant had been threatened or coerced into giving the statement and maintained that the defendant gave the statement freely and voluntarily. The lieutenant testified that food, drink, and the use of a restroom were availed to the defendant during the interview.

On cross-examination, Lieutenant Collins agreed that the defendant "[m]ore than likely" was shackled to a chair in the interview room. The lieutenant stated that, in his presence, the defendant neither asked for an attorney nor told the lieutenant that he had an attorney.

The defendant testified in the suppression hearing that the paramedics came to the house at approximately 6:30 or 6:45 p.m. on July 28, 2008, that the police came later, that he remained in the house while the police investigated, and that after the investigating officers received a telephone call, he was arrested. He was placed in a police car and taken to the police station. He testified that he had not been informed that the victim had died when he signed the acknowledgment and waiver of rights forms. He was informed of her death during the interview and before he signed the written statement. He agreed that he did

not ask for an attorney. He testified that he "really didn't believe" that his daughter had "passed." He stated that he had been up since 8:00 a.m. on July 28 and had sat in the police car for some time.

On cross-examination, the defendant agreed that, prior to his arrest on July 28, 2008, he had been arrested for another homicide and, in that matter, had previously "experienced" the waiver of his rights and the giving of a statement. The defendant agreed that the officers in the present case did not threaten him and that he talked to them freely and voluntarily. The defendant testified, "I won't say that [the police] made me make the statement," but given his "state of mind at that time," he discerned that "half of the things that is in [his] statement, [he] didn't say." He added, "It's like what I said, they took and put in their own words." He agreed that he signed the statement, but he denied that he read it.

The trial court denied the motion to suppress the statement. It found that the defendant was fully advised of his rights and that he "understood those rights and waived the rights and spoke freely to the police officers."

In the pretrial hearing to exclude autopsy photographs of the victim, the State presented 14 photographs that had been taken of the victim's body during various stages of the autopsy. The State argued that, to illustrate the severity of wounds and bruises to the victim's body, it would need to rely upon some photographs that show the dissecting and splaying of the victim's tissues so as to reveal the "force, the depth or the actual injury to the body." Also included in the offering was a picture of the victim's "brain showing the subdural hematoma[,] the actual bleeding in the brain that the doctor describes [][,] and how that swelling occurs." Two other photographs depicted the victim's scalp "peeled back from the skull showing injury coming through." The defense objected to the use of the photographs showing dissections of the victim's tissues, arguing that the physician who performed the autopsy could testify to the extent of the victim's injuries and that the photographs would not "add anything" to the State's case. Rather, the defense argued, the pictures would only prevent the jury from making "any type of an objective determination in this . . . trial."

The trial court reserved ruling on the admissibility of the 14 photographs until Doctor Miguel Laboy, a medical examiner who performed the autopsy on the victim's body, could testify about the utility of or need for the photographs to illustrate his trial testimony. Later, in a jury-out hearing during trial, Doctor Laboy testified that incisions or dissections through the flesh are necessary to evaluate the depth of bruises, especially on dark-skinned victims. He opined that the photographs of these incisions would aid him in describing the severity of injuries to the victim in this case. The trial court ruled that some of the photographs were "extremely probative in the issues that the State has to prove"; however,

the court discerned the possibility of prejudicial effect and granted in part the defendant's motion by rejecting several photographs and allowing only four. The court commented in detail about the probative value in relation to the prejudicial effect of specific photographs. The photographs allowed by the trial court depicted the dissection-exposed injuries to the victim's scalp, legs, buttocks, and arm.

*Trial*

At trial, Pamela Rogers, the victim's mother, testified that the defendant was the father of the victim. The three, along with "Quinton," the defendant's "play cousin," lived together in July 2008 in a one-bedroom apartment. Ms. Rogers testified that, on July 27, she, the defendant, and the victim returned home from a friend's house where Ms. Rogers had washed clothes. Ms. Rogers took a bath and retired. When she changed the two-year-old victim into night clothes, she noticed no marks or bruises on the victim's body, and the victim made no complaints. The victim, who was in the process of "potty" training, wore "pull-up" underpants. The victim slept in the bed with Ms. Rogers and the defendant. Quinton slept on the bedroom floor.

Ms. Rogers slept until 1:36 p.m. on July 28 and was alone in the bedroom when she awoke to a slapping sound and the defendant's voice coming from the bathroom. Ms. Rogers heard the defendant's telling the victim to say "pot" and heard the victim's crying. Ms. Rogers testified that she heard the slapping sound five to ten times. After about ten minutes, the victim walked out of the bathroom crying. The defendant emerged from the bathroom with a white belt in his hand. Ms. Rogers admitted that she did not ask the defendant about what he had been doing. The victim lay on the bed, and the defendant left the apartment to check the mail. Ms. Rogers noticed bruises on the backs of the victim's legs.

When the defendant returned to the apartment with the mail, he told Ms. Rogers that she had received a letter from the Department of Human Services about missing her "benefits" appointment. Ms. Rogers went to the kitchen to call the department about the missed appointment. She testified that the defendant made a bologna sandwich for the victim and took it into the bedroom where the victim had remained. Ms. Rogers testified that, afterward, the defendant yelled to her in an angry voice that the victim was "crumbling up" the bread. Ms. Rogers, still on the telephone, heard the defendant hit the victim about three times and heard the victim's crying.

When the defendant came back to the kitchen and knocked the telephone from Ms. Rogers' ear, she returned to the bedroom and resumed the telephone call while dressing the victim and putting the victim's hair into pigtails. As the victim was sitting on Ms.

Rogers' lap, the victim "just slid down" Ms. Rogers' leg. The victim did not get up and was not responsive. Ms. Rogers pulled the victim up, laid her face down across Ms. Rogers' knees, and resumed the telephone call and the pigtailing of the victim's hair. She said the victim was turning her head around. Soon, the victim's "head started to jerking." When the victim opened her mouth, Ms. Rogers saw bologna and bread in her mouth which Ms. Rogers tried to remove with her finger. While Ms. Rogers held the victim, who had been making unintelligible sounds, Ms. Rogers noticed that the victim stopped breathing.

Ms. Rogers testified that she told the defendant that the victim was not breathing and that the defendant made two telephone calls to friends, asking, without success, for a ride to the hospital. The defendant then asked Ms. Rogers whether she wanted to call "911." She told the defendant to place the call. Ms. Rogers continued to hold the victim until "firemen" came to the apartment. The men took the victim to an ambulance and "hooked [her] up . . . to some cords." Ms. Rogers rode in the ambulance to the hospital, where the victim was pronounced dead.

On cross-examination, Ms. Rogers admitted that, when the victim first slid down Ms. Rogers' leg, Ms. Rogers thought she was misbehaving, and she spanked the victim with her hand. On redirect examination, Ms. Rogers testified that the spanking consisted of slapping the victim on the wrist.

Richard Ringer testified that he was a paramedic for the Memphis Fire Department. After testifying about his training and qualifications, he testified that he answered a dispatch on July 28, 2008, to an apartment where he found the unresponsive victim lying on the floor next to the bed. The victim had "agonal respirations" – very slow breathing, usually a sign of proceeding into "respiratory arrest." Mr. Ringer could not discern a pulse. He testified that he determined that the victim had a clear airway before beginning cardio-pulmonary resuscitation (CPR).

Mr. Ringer testified that he tried to speak to the child's mother but could not get her to respond. He testified that the defendant was "on his cell phone the majority of the time while we were on the scene." Mr. Ringer said that he "finally did get from the father that he believed the child was choking, he had fed her a baloney sandwich." Mr. Ringer testified that the defendant told him that the victim had been unresponsive about half an hour before the 911 call was made.

Wendy Seely, a Memphis Fire Department "[f]ire fighter/paramedic," testified that she responded to the July 28, 2008 call and found the "first responders" already working on the victim, who was "lying as straight as possible like a soldier at attention." Ms. Seely testified that the victim "wasn't choking"; she found nothing obstructing the victim's airway

to her lungs. The lungs were "clear," without sounds of aspiration, which means, she testified, that the victim had not "swallowed any vomiting or drooling or anything else like that." Ms. Seely testified that the appearance of the victim's pupils indicated "[h]ead trauma." Ms. Seely testified that she noticed bruises on the lower half of the victim's body. The victim was "cold to the touch."

Ms. Seely said that she was unable to ask questions of the child's mother because the "baby's father" kept "stepping in between to make sure . . . I couldn't communicate with her."

Memphis Police Department Lieutenant Eddie Bass testified that on July 28, 2008, at about 9:30 or 10:00 p.m., he was assigned the task of team leader in the investigation of the victim's homicide. He identified items that the police found in the Blake apartment, including a white belt. He testified that the police detained the defendant and took him to the police station. Lieutenant Bass assigned Sergeants Lundy and Collins the task of interviewing the defendant.

Memphis Police Department Sergeant Kevin Lundy testified that he along with Sergeant Collins interviewed the defendant on July 28, 2008. He outlined the officers' approach to taking a statement from the defendant in substantially the same manner as did Sergeant Collins in his suppression hearing testimony. He testified that the defendant told him that the victim had "'used the restroom on herself,'" that in response he tried to get her to say "'pot,'" and that when she would not, he "'disciplined'" her. Sergeant Lundy testified that the defendant admitted disciplining the child again with a belt after she "'wadded'" the bread of her sandwich. Based upon these oral statements, the officers asked the defendant to give a formal written statement, which was exhibited to Sergeant Lundy's testimony and read to the jury.

In this typewritten statement, which Sergeant Lundy described as "word for word," the defendant, who was informed that he was under arrest for homicide, answered "Yes" when asked whether he was responsible for the victim's death. The statement described the defendant's actions on July 28, 2008. At about 8:00 a.m., he smoked a "blunt" then went to "one of [his] partner's house." When he returned to his apartment, he put the victim on the "pot" and asked her to say "pot." When she did not, he "whipped her legs and she was trying to block with her hands so [he] hit her hands" and hit her "across the back with a belt" when she bent over. The defendant stated that he later made a bologna sandwich and gave half of it to the victim. When she tried to lie down with the food in her mouth, he "hit her on the legs with a belt." He stated, "That's when she jumped up and act[ed] like she was going to pass out." He said that, after he could not find anyone to take them to the emergency room, he called 911 and that he followed the 911 respondent's telephone

instructions for administering CPR.

When asked how many times the defendant struck the victim on the back while she was "on the pot," the defendant said, "A lot of times." The defendant stated that he was in the bathroom with the victim about 30 minutes. The defendant admitted that he had struck the victim on the "butt" and the back "[a] lot of times" and that he used Ms. Rogers' white dress belt, which was approximately one and one-half inches wide.

Doctor Laboy, in the presence of the jury, described his medical education, certifications, and experience and testified that he performed the July 29, 2008 autopsy on the victim's body. He testified about, and introduced photographs to show, a number of abrasions and contusions appearing externally on the victim's right forearm, thighs, and lower legs. Some of the contusions were overlapping.

Doctor Laboy explained the dissection procedure used to assess the depth of bruises. He introduced a total of four photographs depicting dissection-exposed injuries to the victim's scalp, buttocks, and legs.

After a detailed description of the damage to tissue revealed in the autopsy, Doctor Laboy opined that the victim died from multiple blunt force trauma that caused "substantial blood loss in soft tissues." He commented that a child weighing about 25 pounds, as did the victim, would have only about a liter of blood in her body and that significant loss of blood through soft tissue injury impairs the body's ability to supply oxygen to vital organs. The doctor was unable to opine whether the belt that had been introduced into evidence was the instrumentality of the injuries because, in part, so many of the contusions were confluent.

Doctor Laboy's testimony concluded the State's case, and the defense offered no evidence. The jury convicted the defendant of one count of first degree murder committed in the perpetration of aggravated child abuse and one count of first degree murder committed in the perpetration of aggravated child neglect. The trial court attempted to merge the verdicts into one judgment of first degree murder. The defendant was sentenced to life in prison.

*Appellate Issues*

*Sufficiency of the Evidence*

In the defendant's first issue, he claims that the evidence establishing the elements of mens rea and causation is insufficient.

We review the defendant's claim about evidence insufficiency mindful that our standard of review is whether, after considering the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. Tenn. R. App. P. 13(e); *Jackson v. Virginia*, 443 U.S. 307, 324 (1979); *State v. Winters*, 137 S.W.3d 641, 654 (Tenn. Crim. App. 2003). This standard applies to findings of guilt based upon direct evidence, circumstantial evidence, or a combination of direct and circumstantial evidence. *Winters*, 137 S.W.3d at 654.

When examining the sufficiency of the evidence, this court should neither re-weigh the evidence nor substitute its inferences for those drawn by the trier of fact. *Id.* at 655. Questions concerning the credibility of the witnesses, the weight and value of the evidence, as well as all factual issues raised by the evidence are resolved by the trier of fact. *State v. Cabbage*, 571 S.W.2d 832, 835 (Tenn. 1978). To implement these rules, this court must afford the State the strongest legitimate view of the evidence contained in the record as well as all reasonable and legitimate inferences which may be drawn from the evidence. *Id.*

First felony degree murder includes "a killing of another committed in the perpetration of or attempt to perpetrate any . . . aggravated child abuse [or] aggravated child neglect." T.C.A. § 39-13-202(a)(2). The criminal code provides that, in establishing felony murder, "[n]o culpable mental state is required for conviction under subdivision (a)(2) . . . , except the intent to commit the enumerated offenses or acts in those subdivisions." *Id.* § 39-13-202(b).

Based upon the indictment in the present case, "[a] person commits the offense of aggravated child abuse [or] aggravated child neglect . . . , who commits child abuse, as defined in § 39-15-401(a) [or] child neglect, as defined in § 39-15-401(b) . . . and: (1) The act of abuse [or] neglect results in serious bodily injury to the child." *Id.* § 30-15-402(a)(1). "Child abuse" is committed by "[a]ny person who knowingly, other than by accidental means, treats a child under eighteen (18) years of age in such a manner as to inflict injury." *Id.* § 39-15-401(a). "Child neglect" is committed by "[a]ny person who knowingly abuses or neglects a child under eighteen (18) years of age, so as to adversely affect the child's health and welfare." *Id.* § 39-15-401(b).

In the present case, the defendant first claims that the State failed to establish that the defendant acted knowingly in committing both offenses. We disagree.

The evidence, including the defendant's own admission, clearly established that the defendant acted knowingly, other than by accidental means, when he repeatedly beat the two-year-old victim with a leather belt, causing serious bodily injury. Accordingly, the

-8-

evidence showed that the defendant committed aggravated child abuse that, upon the death of this child, resulted in first degree felony murder. *See State v. Ducker*, 27 S.W.3d 889, 897 (Tenn. 2000) ("Once the knowing mens rea [for aggravated child abuse or aggravated child neglect] is established, the next inquiry under the plain language of the statute is simply whether the child sustained an injury or, in the case of child neglect, whether the child suffered an adverse effect to the child's health or welfare. The [statute] . . . clearly indicate[s] that if an injury results from knowing abuse or neglect, the actor has committed child abuse."). In addition to the evidence of the defendant's beating the victim, the evidence also established that the defendant acted knowingly in neglecting to expedite medical care for up to 30 minutes for his young daughter after she had stopped breathing.

In a reply brief, the defendant further claims that the evidence supporting the conviction of felony murder predicated upon aggravated child neglect is deficient because it failed to demonstrate causation of the homicide via neglect.

To be sure, causation is a necessary element in any homicide case, *see State v. Farner*, 66 S.W.3d 188, 204 (Tenn. 2001), and certainly the evidence in the present case established that the defendant's abusive beating of the victim caused her death. We agree that, apart from the proof of the defendant's actions that supported the finding of aggravated child abuse, the evidence did not establish beyond a reasonable doubt that the defendant's omissions following the beatings caused the victim's death. We are also aware that in *State v. John Barlow*, No. W2008-01128-CCA-R3-CD (Tenn. Crim. App., Jackson, Apr. 26, 2010), *perm app. denied* (Tenn. 2010), this court, in reviewing convictions of aggravated child abuse and a conviction of aggravated child neglect, said:

> Upon review of the record, the evidence presented at trial did not establish that Barlow's delay in seeking medical treatment had an "actual, deleterious effect" on the victim's health. Instead, the evidence showed that Barlow's initial act of abuse caused serious bodily injury to the victim. The State failed to prove the elements of aggravated child neglect beyond a reasonable doubt at trial. Specifically, the State failed to prove that Barlow "knowingly" neglected the victim after the initial injury, that this neglect "adversely affect[ed] the child's health and welfare[,]" and that the neglect "result[ed] in serious bodily injury" apart from the initial injury that the victim had suffered.

*Id.*, slip op. at 14. The holding was not based upon principles of double jeopardy.

We believe, however, that the principle expressed by the excerpt from *John*

*Barlow* does not control the disposition of count two, felony murder predicated upon aggravated child neglect. In *John Barlow*, the defendant was charged in two counts, one for aggravated child abuse and one for aggravated child neglect. In that case, the State essentially elected that the basis for the neglect charge was the failure to seek medical assistance after the infliction of the initial injury. In other words, the State sought one conviction based upon specified behavior of the defendant (inflicting injury) and sought a second conviction based upon *different* behavior (failing to seek medical help). In that context, the *John Barlow* court held that the evidence did not establish causation of the actual, deleterious effect of serious bodily injury, so as to support a conviction separate from – and in addition to – the conviction of child abuse that actively caused the injury. *Id.*

In the present case, however, only one offense is charged, albeit in two different modes. The offense is first degree felony murder. Only one homicide occurred. The two-count indictment bespeaks two different theories of culpability for the same crime. This occurs more commonly when the State, in a homicide, charges a defendant with both premeditated first degree murder and felony first degree murder. *Compare* T.C.A. § 39-13-202(a)(1) *with id.* §39-13-202(a)(2). "Obviously, when only one person has been murdered, a jury verdict of guilt on more than one count of an indictment charging different means of committing first degree murder will support only one judgment of conviction for first degree murder." *State v. Cribbs*, 967 S.W.2d 773, 788 (Tenn. 1998). We allow the State, however, to initially proceed in this *alternative* fashion. *See, e.g.*, *State v. Jordan*, 325 S.W.3d 1, 31 (Tenn. 2010); *State v. Henretta,* 325 S.W.3d 112, 117 (Tenn. 2010). When verdicts of guilty are returned on both counts, we avoid violating principles of double jeopardy by merging the verdicts into one judgment of conviction. *Cribbs*, 967 S.W.2d at 787-88; *see also, e.g.*, *State v. Marlon Duane Kiser*, 284 S.W.3d 227, 234 (Tenn. 2009); *State v. Conway*, 77 S.W.3d 213, 218 (Tenn. Crim. App. 2001); *State v. Cowan*, 46 S.W.3d 227, 236 n.1 (Tenn. Crim. App. 2000).

We see no reason why the merger rule of *Cribbs* could not apply with equal force when alternative modes of felony murder are presented. We discern that, in the present case, the two-count indictment expressed alternative theories of felony murder and that, pursuant to *Cribbs*, the verdicts or findings of guilty may stand, subject to the requirement of merging the verdicts into one conviction. This conclusion is supported by the record. We found no indication that count two, felony murder predicated upon aggravated child neglect, was presented to the jury as anything other than an alternative to count one, felony murder predicated upon aggravated child abuse. The arguments of counsel were not presented in the record. In the instructions imparted to the jury, the trial court did not attribute count one to certain behavior and count two to different behavior. Thus, we conclude that the case differs from *John Barlow* and hold that the charges in the present case were presented as alternatives of the same offense. We believe this interpretation of the indictment is accommodated by

the statute that proscribes child neglect. Tennessee Code Annotated section 39-15-401(b), in separating the proscription of child-neglect/adverse-affect from child-abuse/injury contained in subsection (a), refers to "abuse[] or neglect[]" as alternative bases for "adversely affect[ing] the child's health and welfare." Thus, we believe that the defendant's beating the victim in the present case could have been the sole or partial basis for a conviction in count two. *State v. Adams,* 24 S.W.3d 289, 296 (Tenn. 2000) (holding that "the General Assembly intended for the offense of aggravated child abuse through neglect to punish a continuing course of knowing conduct beginning with the first act or omission that causes adverse effects to a child's health or welfare").

In summary, the evidence in the present case is sufficient to support the convictions, and we reject the challenges based on the issues of mens rea and causation.

*Admission of Autopsy Photographs*

The defendant claims that the trial court erred by admitting photographs showing dissection of the victim's tissues. We disagree.

The admissibility of photographs in this case is governed by Tennessee Rules of Evidence 401, 402, and 403. *See State v. Banks*, 564 S.W.2d 947, 949-51 (Tenn. 1978). Under these rules, the trial court must determine, first, whether the photograph is relevant. *See* Tenn. R. Evid. 401; *Banks*, 564 S.W.2d at 949. If the evidence is irrelevant, it is inadmissible. Tenn. R. Evid. 402. If the evidence is relevant, meaning that it has "any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence," *see* Tenn. R. Evid. 401, the trial court then must determine whether the probative value of the photograph is substantially outweighed by the danger of unfair prejudice, *see* Tenn. R. Evid. 403; *Banks*, 564 S.W.2d at 950-51. The term "unfair prejudice" has been defined as "'[a]n undue tendency to suggest decision on an improper basis, commonly, though not necessarily, an emotional one.'" *Banks*, 564 S.W.2d at 951.

Photographs offered by the State must be relevant to prove some material aspect of its case and must not be admitted solely to inflame the jury and prejudice it against the defendant. "[P]hotographs are not necessarily rendered inadmissible because they are cumulative of other evidence or because descriptive words could be used." *State v. Leach*, 148 S.W.3d 42, 63 (Tenn. 2004); *see Collins v. State*, 506 S.W.2d 179, 185 (Tenn. Crim. App. 1973); *see also State v. Collins*, 986 S.W.2d 13, 21 (Tenn. Crim. App. 1998) (stating that, "[a]s a general rule, where medical testimony adequately describes the degree or extent of an injury, gruesome and graphic photographs should not be admitted"). Where apt, photographs may be used to illustrate the testimony of witnesses on issues such as the cause

of a victim's death. *Id.*

Whether to admit the photographs rests within the sound discretion of the trial court, and the determination will not be reversed absent a clear showing of an abuse of that discretion. *Id.* at 949; *see also State v. Dickerson*, 885 S.W.2d 90, 92 (Tenn. Crim. App. 1993).

In the present case, the trial court conducted a jury-out hearing that included the testimony of Doctor Laboy. Based upon the trial court's comments, it carefully examined 14 photographs offered by the State and admitted only four photographs that showed dissection of the victim's tissues. Doctor Laboy testified that these photographs served to illustrate his description of substantial soft tissue injury. The victim's death resulted from blood loss in soft tissue. The trial judge commented in detail about the offered photographs; he made cogent findings of probative value and prejudicial effect. We hold that the trial court did not abuse its discretion in admitting four of the photographs.

*Admission of the Defendant's Pretrial Statement*

In his final issue, the defendant claims that the trial court erred by not suppressing the defendant's written statement supplied to the police on July 28-29, 2008. He asserts that neither his waiver of rights nor the statement itself was knowing or voluntary. The record, however, supports the trial court's ruling.

When reviewing a trial court's findings of fact and conclusions of law on a motion to suppress evidence, we are guided by the standard of review set forth in *State v. Odom*, 928 S.W.2d 18 (Tenn. 1996). Under this standard, "a trial court's findings of fact in a suppression hearing will be upheld unless the evidence preponderates otherwise." *Odom*, 928 S.W.2d 18, 23 (Tenn. 1996). However, when the trial court does not set forth its findings of fact upon the record of the proceedings, the appellate court must decide where the preponderance of the evidence lies. *Fields v. State*, 40 S.W.3d 450, 457 n.5 (Tenn. 2001); *see Ganzevoort v. Russell*, 949 S.W.2d 293, 296 (Tenn. 1997). As in all cases on appeal, "[t]he prevailing party in the trial court is afforded the 'strongest legitimate view of the evidence and all reasonable and legitimate inferences that may be drawn from that evidence.'" *See State v. Carter*, 16 S.W.3d 762, 765 (Tenn. 2000) (quoting *State v. Keith*, 978 S.W.2d 861, 864 (Tenn. 1998)). Furthermore, we review the trial court's conclusions of law under a de novo standard without according any presumption of correctness to those conclusions. *See, e.g.*, *State v. Walton*, 41 S.W.3d 75, 81 (Tenn. 2001); *State v. Crutcher*, 989 S.W.2d 295, 299 (Tenn. 1999).

A confession must be free and voluntary, and it must neither be "'extracted by

-12-

any sort of threats or violence, nor obtained by any direct or implied promises, . . . nor by the exertion of any improper influence'" or police overreaching. *Bram v. United States*, 168 U.S. 532, 542-43 (1897) (citation omitted). The issue of voluntariness requires the trial judge to focus on whether the accused's will to resist making a confession was overborne. *State v. Kelly*, 603 S.W.2d 726, 728 (Tenn. 1980). At an evidentiary hearing, the State has the burden of demonstrating by a preponderance of the evidence that the defendant's statement was voluntary, knowing, and intelligent. *Id*.

The defendant's statement was given during custodial interrogation. In addition to the requirement that a confession be knowing and voluntary, the Fifth Amendment right to counsel attaches during custodial interrogation. *Edwards v. Arizona*, 451 U.S. 477 (1981). If a defendant requests counsel while being given his warnings pursuant to *Miranda v. Arizona*, 384 U.S. 436, 444-45 (1966), or during custodial interrogation, the interrogation must cease. *Edwards*, 451 U.S. at 482. Before a defendant can knowingly and voluntarily waive his *Miranda* rights, the defendant must be "adequately and effectively apprised of his rights." *State v. Middlebrooks*, 840 S.W.2d 317, 326 (Tenn. 1992). If the waiver is made "voluntarily, knowingly and intelligently," a defendant may waive his rights. *Miranda v. Arizona*, 384 U.S. 436, 444 (1966). The State has the burden of proving the waiver by a preponderance of the evidence at the hearing on the motion to suppress. *State v. Bush*, 942 S.W.2d 489, 500 (Tenn. 1997). In determining whether a defendant has validly waived his *Miranda* rights, courts look to the totality of the circumstances. *Middlebrooks*, 840 S.W.2d at 326.

In the present cases, the trial judge expressed his findings on the record, and they support conclusions that the defendant's waiver of his rights and the giving of his statement were knowing and voluntary. Although the defendant was shackled to his chair in the interrogation room, the record evinces no hint of coercion. The court accredited testimony that the defendant was not impaired during the interview. He had not been deprived of food, water, or other comforts and had not been detained an unduly long time. Although the defendant claimed that he did not read the typed statement and that the wording was not his, the officer at trial testified that the statement was "word for word" that of the defendant. Moreover, the defendant, who had a ninth- or tenth-grade education, made a correction on the typed statement and admitted that he initialed the pages and signed the document. In his suppression hearing testimony, he did not specify any portions of the statement that were inaccurate or inauthentic. Thus, as stated above, the record supports the trial court's ruling, and we hold that the trial court did not err in overruling the motion to suppress.

*Conclusion and Remand*

In conclusion, this court affirms the convictions.

That said, we discern anomalies in the judgments, however, that the trial court should address. The verdict or finding of guilty was not expressed in either judgment; although the blocks for "jury verdict" on the judgment forms were checked, the blocks indicating a finding of either "guilty" or "not guilty" were not checked. To indicate a finding or verdict of guilty, the "guilty" block should be checked.

Additionally, two "judgments" appear to have been entered. Both forms indicate sentencing and the alignment of the respective sentences. As we indicated above in this opinion, the proper disposition of the charges upon the jury's verdicts was to merge the guilty verdicts into one judgment of conviction, as the trial court intended to do. To effect merger, only one judgment should be entered, and only one sentence should be imposed. On remand, the trial court should vacate the judgment in count two, and amend the judgment in count one to indicate the proper finding by the jury, as noted in the preceding paragraph, and to memorialize the merger of count two into count one.

_____
JAMES CURWOOD WITT, JR., JUDGE

-14-